IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

| | | |
|---|---|---|
| DIANA K. LIVINGSTON, | * | |
| Plaintiff, | * | |
| v. | * | |
| DATEX-OHMEDA, INC. | * | Civil Action No.: WDQ 05 CV 3401 |
| and | * | |
| GENERAL ELECTRIC CO., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Datex-Ohmeda, Inc. and General Electric Company ("Defendants"), through undersigned counsel, respectfully submit this Memorandum of Points and Authorities in Support of their Motion for Summary Judgment. The record evidence in this matter establishes that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law as to Plaintiff's claims of retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). Defendants' Motion for Summary Judgment should therefore be granted, judgment should be entered in favor of Defendants and against Plaintiff as to all of Plaintiff's claims, and the Complaint should be dismissed with prejudice.

## INTRODUCTION

Plaintiff Diana Livingston worked for GE Healthcare[1] for just over three years between 2001 and 2004. During that time she compiled a long list of formal and informal discipline, much of which related to her disruptive conduct and inappropriate interactions with co-workers and superiors. Plaintiff's disruptive behavior reached a head in the spring and early summer of 2004 and led to several written warnings for safety violations and incidents of disruptive behavior. When she was caught falsifying her time sheets only days after a string of misconduct that led to a written warning, GE Healthcare terminated her employment.

Plaintiff's Complaint alleges, without support, that her discipline and ultimate dismissal were without basis, and that GE Healthcare retaliated against her for filing a complaint with the Equal Employment Opportunities Commission in November, 2003. Plaintiff's Complaint should be dismissed because she is unable to establish a *prima facie* case of retaliation under either Title VII or Section 1981, and further because GE Healthcare can establish legitimate non-retaliatory reasons for all of its actions.

## STATEMENT OF FACTS

GE Healthcare is a leading manufacturer of medical devices. The company manufactures neonatal medical devices at its Laurel, Maryland facility. Plaintiff was hired to work as an electronics assembler on the evening shift on March 8, 2001. (*Deposition of Laura Heinrich, excerpts of which are attached hereto as Exhibit 1, at 6:8-6:12 and Ex. 1 thereto.*[2])

---

[1] GE Healthcare acquired Datex-Ohmeda in 2003. Thus, Livingston began her employment as an employee of Datex-Ohmeda and, by the time her employment was terminated, had become an employee of GE Healthcare. For the purposes of this Memorandum, both entities are referred to as "GE Healthcare."

[2] Citation to deposition pages and lines will herein be indicated as page:line(s). Thus, this citation is to the deposition of Laura Heinrich at page 6, line 8 through page 6 line 12 and Exhibit 1 to Ms. Heinrich's deposition. Further, for ease of reference all excerpts of Ms. Heinrich's deposition, as well as the relevant exhibits to her deposition, are filed as Exhibit 1. The identical practice is followed for all six exhibits to this Memorandum.

A.     **Plaintiff's Long History of Disruption, Insubordination and Discipline**

Plaintiff's reviews were poor. On her January 10, 2003 and June 11, 2003 performance reviews, Plaintiff was given a "not acceptable" rating on overall disposition, and was rated below expectations for attendance and safety. (*Affidavit of Laura Heinrich, which is attached hereto as Exhibit 2, at ¶3g; Deposition of William Knight, excerpts of which are attached hereto as Exhibit 3, at Exs. 1, 2*.) For those performance reviews, her then supervisor, Chris Scott, noted that overall she was "very confrontational, both with management and with some of her coworkers," and, later, that she was "very combative" and had a "non team-player mentality." (*Id.*) On her April 13, 2004 performance review, Plaintiff was again rated "not acceptable" on overall disposition and safety, and was rated below expectations for attendance, and her supervisor, Linda Marroquin, noted that she was "often uncooperative and confrontational." (*Deposition of Diana Livingston, excerpts of which are attached hereto as Exhibit 4, at 83:14-84:1 and Ex. 7 thereto.*)

Apart from her performance reviews, Plaintiff also had continual run-ins with her supervisors. For example, on October 3, 2002, plaintiff threatened to cut a coworker with whom she was involved in an argument with a knife. (*Knight Dep. (Ex. 3) at 53:19-57:17.*) Company president Andy Krakauer met with both employees and verbally warned them that they were close to losing their jobs and that it was a final warning to both employees. (*Heinrich Aff. (Ex. 2) at ¶3h; Livingston Dep. (Ex. 4) at Ex. 10.*)

Plaintiff's misconduct continued in February of 2004, when in response to an e-mail from Ms. Marroquin that there was going to be an all employee meeting regarding the departure of company president Andy Krakauer, Plaintiff responded that she would not attend. (*Heinrich Aff. (Ex. 2) at ¶3a; Livingston Dep. (Ex. 4) at Ex. 20.*) Ms. Marroquin informed Plaintiff that if she did not go to the meeting, she would be written up for insubordination. (*Id.*) To that, Plaintiff

3

responded that she would go, but when Mr. Krakauer said his goodbyes, she would be clapping in the background (presumably delighted that he was departing). (*Id.*) When Ms. Marroquin asked Plaintiff not to clap, Plaintiff insisted that she would. (*Id.*) Plaintiff was informed that since she had been asked not to clap, doing so would be interpreted as insubordination. (*Id.*)

Plaintiff's next disruption came barely a week later. On February 17, 2004, Plaintiff approached Ms. Marroquin in a very upset and angry manner complaining that the day shift employees had been "snooping around" her work station. (*Heinrich Aff. (Ex. 2) at ¶3b; Livingston Dep. (Ex. 4) at Ex. 21.*) Plaintiff further stated that the day shift employees "had no business snooping around her station." (*Id.*) Ms. Marroquin informed Plaintiff that, in fact, the day shift supervisor had been looking for work supplies, and had every right to look around an employee's work station. (*Id.*)

On March 11, 2004, plaintiff received a written warning for a safety violation after Ms. Marroquin had spoken with her about wearing proper safety shoes on two different occasions. (*Heinrich Aff. (Ex. 2) at ¶3c; Livingston Dep. (Ex. 4) at Ex. 5.*) The written warning stated that "This type of conduct will not be allowed or tolerated. To repeat this type of conduct can and will lead to further disciplinary actions up to and including termination." (*Id.*) Plaintiff refused to sign this written warning, but gave no explanation for her actions. (*Id.*)

The next disruptive and combative situation involving Plaintiff occurred on April 13, 2004. Plaintiff became very upset when she was given her review and stormed out of the room saying that she wanted some privacy and did not want to be near another of her supervisors, Pam Johnson. (*Heinrich Aff. (Ex. 2) at ¶3d; Heinrich Dep. (Ex. 1) at Ex. 4.*) Her supervisors then observed her yelling to other employees that "All our asses were fired and we just didn't know it yet." (*Id.*) Plaintiff then asked Ms. Marroquin why she had scored low in safety on her review,

4

to which Ms. Marroquin replied that she had been given a written warning regarding her shoes on March 11, 2004.  (*Heinrich Aff. (Ex. 2) at ¶¶ 3d, f; Heinrich Dep. (Ex. 1) at Ex. 4; Livingston Dep. (Ex. 4) at Ex. 6.*)  Plaintiff said that was "shit."  (*Id.*)  Plaintiff then yelled out in the presence of other employees "I didn't get a raise," which she labeled "bull."  (*Id.*)  She was assured that she had received a raise but that her check had not reflected that fact yet because she had just returned to work from medical leave.  (*Id.*)  Plaintiff then said to Ms. Marroquin "It doesn't matter your ass is fired and you just don't know it yet and Craig Jeznach's ass is fired too and all the rest of them are fired."  (*Id.*)  Plaintiff refused to sign her review.  (*Id.*)

The hits just kept coming.  On April 14, 2004, Plaintiff falsely claimed that supervisors had called a meeting, causing several employees to leave their work stations.  (*Heinrich Aff. (Ex. 2) at ¶3e; Heinrich Dep. (Ex. 1) at 14:8-14:19; Deposition of Craig Jeznach, excerpts of which are attached hereto as Exhibit 5, at 32:12-33:11.*)  On April 15, 2004, Ms. Marroquin held a group meeting for the evening shift to emphasize GE Healthcare's policy of not allowing employees to use cell phones on the production floor during work time.  (*Heinrich Dep. (Ex. 1) at 17:5-17:14; Heinrich Aff. (Ex. 2) at ¶3f; Livingston Dep. (Ex. 4) at Ex. 6.*)  Plaintiff's response was to walk around the production floor singing "I got shackles on my feet" and "we got shackles on our ankles" loudly enough for the other employees to hear.  (*Id.*)  On April 29, 2004, Ms. Marroquin approached plaintiff about gossiping on the shop floor, and plaintiff walked away saying that she did not have "time to listen to this."  (*Heinrich Aff. (Ex. 2) at ¶3f; Livingston Dep. (Ex. 4) at Ex. 6.*)

As a result of this repeated disruptive behavior, Plaintiff received written warning on May 10, 2004 citing her "disruption and insubordination (sic) performance."  (*Id.*)  The warning cited the "asses are fired" incident, the false meeting, the "shackles on my feet" incident, and the

5

"I don't have time to listen to this" incident. (*Id.*) The written warning concluded, "This type of conduct is inexcusable and will not be tolerated. To continue this type of conduct will result in further corrective action up to and including termination." (*Id.*) When he gave plaintiff this written warning on May 11, 2004, Mr. Jeznach verbally warned her that the next time she would be fired. (*Livingston Dep. (Ex. 4) at 29:3-29:6.*) Plaintiff, again, refused to sign this written warning. (*Heinrich Aff. (Ex. 2) at ¶ 3f; Livingston Dep. (Ex. 4) at Ex. 6.*)

The last straw came on Friday, May 7, 2004. On that evening, plaintiff was scheduled to work, as she usually did, from 3:30 p.m. to 12:00, with a half hour off for lunch between 8:00 and 8:30. (*Heinrich Aff. (Ex. 2) at ¶5.*) Ms. Marroquin was having a birthday celebration on that evening during the normal break period of 8:00 to 8:30, but attendance was by no means required. (*Id.*) Ms. Livingston left the facility at 8:00, but did not return at the end of her break period, and in fact stayed away until 8:57. (*Id.*) Ms. Heinrich verified her return time by looking at a security videotape. (*Heinrich Dep. (Ex. 1) at 25:7-26:17.*) Then, without asking permission, Ms. Livingston left work at 11:30 p.m. rather than 12:00. (*Heinrich Aff. (Ex. 2) at ¶5.*) Ms. Livingston recorded 8 hours of paid time on her time slip, in spite of only working 7 hours for the evening. (*Id.*) When this matter was brought to the attention of management and the Human Resources department the following week, the decision was made to terminate plaintiff's employment. (*Heinrich Dep. (Ex. 1) at 29:18-30:9.*)

**B.     Plaintiff's Allegations**

On December 4, 2003, Plaintiff filed a charge of discrimination with the EEOC alleging that she had been discriminated against when she was denied several promotions. (*Livingston Dep. (Ex. 4) at 157:13-157:20 and Ex. 13 thereto.*)[3]  Plaintiff alleges that after she filed her discrimination charge with the EEOC, "the [d]efendant began to retaliate against [her] by ostracizing and isolating her," "remov[ing] her from her normal work area and station," forc[ing] her to work in the dirtiest area of the plant at a makeshift work station," and "sp[ying on] and scrutiniz[ing] her." (*Amended Complaint at ¶ 10.*)  She also claims that, just after terminating her employment, Mr. Jeznach told her in an angry, raised voice, "this will teach you to file a complaint against us that you can't prove." (*Amended Complaint at ¶ 12; Livingston Dep. (Ex. 4) at 37:13-38:7.*)

Many of Plaintiff's allegations appear to stem from allergy problems and complaints about bugs that led her physician to urge her to be moved away from dust and boxes, and GE Healthcare's attempts to accommodate those complaints.[4] (*Livingston Dep. (Ex. 4) at 263:14-263:18 and Ex. 22 thereto.*)  She expanded on some of her allegations in her deposition.  In particular, Plaintiff complained in her deposition of being "made" to wear a white paper protective suit. (*Livingston Dep. (Ex. 4) at 237:10-237:12.*)  In fact, and as Plaintiff later admitted, she was offered the suit in response to an August 25, 2003 request from her doctor that she not be exposed to allergens. (*Livingston Dep. (Ex. 4) at 237:16-240:2 and Ex. 22 thereto.*)

---

[3] Plaintiff moved to amend her complaint to allege discrimination in violation of Title VII and Section 1981 stemming from GE Healthcare's alleged failure to promote her. (*Motion to Amend/Correct by Diana K. Livingston*, August 19, 2007, Docket No. 36.)  This Court denied that Motion on October 29, 2007. (*Memorandum of Opinion*, October 29, 2007, Docket No. 53.)

[4] Some evidence appears to point to the fact that Plaintiff's complaints about dust and bugs may have been exaggerated.  After Plaintiff complained, Datex Ohmeda retained an industrial hygienist to conduct an Indoor Air Quality Assessment on September 15, 2003. (*Heinrich Dep. (Ex. 1) at 7:7-8:18 and Ex. 2 thereto; Jeznach Dep. (Ex. 5) at 36:15-37:14*).  That Assessment found "no potentially significant conditions . . . that could account for the reported complaints of skin itching from 'bug bites'." (*Id.*)

As for ostracizing and isolating her by removing her from her workstation to a dirty area of the plant, Plaintiff testified that these actions took place in June or July of 2003, also well before she filed the EEOC charge. (*Livingston Dep. (Ex. 4) at 235:7-235:20.*)  The move was also motivated by her requests to be placed away from allergens. (*Jeznach Dep. (Ex. 5) at 35:10-35:18*).

Plaintiff's example of GE Healthcare "scrutinizing" her boiled down to her unhappiness with what she claimed to be Mr. Jeznach's frequent requests to speak with her about her time sheets. (*Livingston Dep. (Ex. 4) at 246:18-247:12.*) These requests began, she claimed, in early 2003. (*Id.*)

Plaintiff also claimed that GE Healthcare ostracized her by telling African American employees not to talk to her. (*Livingston Dep. (Ex. 4) at 241:8-241:10.*) She claims that fellow production employees Cynthia Beverly, Pam Powell, Arlene Matthews, Connie Williams, Warren Gladden, Walter Gladden and Lucille, whose last name she could not remember, all received this message from Mr. Jeznach in April, 2004. (*Livingston Dep. (Ex. 4) at 241:11-246:10.*) Connie Williams flatly denied in her deposition that Mr. Jeznach said anything to her, and said that the only person she ever heard mention such a conversation was Cynthia Beverly. (*Deposition of Connie Williams, excerpts of which are attached hereto as Exhibit 6, at 44:7-45:10.*) Mr. Jeznach also denied making any such statement. (*Jeznach Dep. (Ex. 5) at 44:21-45:5.*)

Plaintiff also claims that GE Healthcare retaliated against her by refusing her request to be laid off in the spring of 2004. (*Livingston Dep. (Ex. 4) at 256:8-256:12.*) However, she could point to no other employee who had been laid off prior to her termination. (*Livingston Dep. (Ex. 4) at 258:1-258:7.*)

8

Plaintiff's claim that Mr. Jeznach said "that will teach you to file a complaint against us you can't prove" is entirely uncorroborated. Mr. Jeznach, who had been a manager for many years, said no such thing. (*Jeznach Dep. (Ex. 5) at 28:21-29:5 and 72:2-72:10*.) Ms. Heinrich, a Human Resources Manager who was present at the meeting, confirmed that Mr. Jeznach said no such thing. (*Heinrich Dep. (Ex. 1) at 39:4-40:2*.) Ms. Heinrich was close enough to have heard Mr. Jeznach say anything to plaintiff. (*Heinrich Dep. (Ex. 1) at 36:12-37:2*.) Finally, plaintiff did not see fit to mention this highly salient fact in the complaint to the EEOC that preceded this suit. *(Livingston Dep. (Ex. 4) at Ex. 3.)*

## ARGUMENT

**A.     Summary Judgment Standard**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In a Title VII or Section 1981 action, summary judgment will be granted to the defendant either when plaintiff fails to establish one or more elements of the requisite *prima facie* case or when the defendant puts forth evidence of legitimate, non-retaliatory reasons for the challenged acts and plaintiff fails to rebut those reasons. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

When weighing a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, "the judge must ask . . . whether a fair-minded jury could return a verdict for the [plaintiff] on the evidence presented." *Id.* at 252. Thus, the mere existence of a "scintilla" of evidence will be insufficient to preclude summary judgment. *Id.* Further, plaintiff cannot defeat summary

judgment merely by presenting self-serving, uncorroborated assertions. *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 280-81 (4th Cir. 2000).

**B.    The *Prima Facie* Case and *McDonnell-Douglas* Framework**

The *prima facie* case for retaliation is the same under Title VII and Section 1981. Under both statutes, Plaintiff must show that:  (1) she engaged in a protected activity; (2) GE Healthcare took an action against her "that a reasonable employee would have found . . . materially adverse;" and (3) GE Healthcare's action had a causal connection to the protected activity. *Burlington N. & Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2414 (2006). The standard set forth in *Burlington Northern* does not insulate employees from "petty slights, minor annoyances, and simple lack of good manners" in the work place. *Id.* at 2415. Further, the "reasonable employee" standard is objective. It is intended to avoid "the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective findings." *Id.*

In Title VII and Section 1981 discrimination actions, the courts apply the burden shifting test first articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hawkins v. Pepsico Inc.,* 203 F.3d 274, 281 n.1 (4th Cir. 2000) (applying *McDonnell-Douglas* framework to Section 1981 retaliation claims); *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir. 2000) ("the *McDonnell-Douglas* burden shifting scheme applies in analyzing retaliation claims under Title VII").

Under the familiar *McDonnell-Douglas* burden shifting framework, if Plaintiff successfully establishes a *prima facie* case of retaliation, GE Healthcare has the opportunity to articulate legitimate non-retaliatory reasons for the adverse employment acts. *McDonnell-Douglas*, 411 U.S. at 802-05. If GE Healthcare successfully articulates such reasons, the burden shifts back to Plaintiff, who must then put forth evidence that GE Healthcare's reasons were

actually mere pretext for prohibited retaliation. *Id.* Plaintiff always bears the ultimate burden of showing that GE Healthcare's proffered reasons were not its true reasons, but rather were a pretext for discrimination. *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir. 1996).

C. **Plaintiff's Allegations Cannot Withstand Summary Judgment**

Plaintiff's claims fail for at least two reasons. First, she is unable to establish a *prima facie* case of retaliation under Title VII or Section 1981 because: (1) several of the allegedly adverse actions occurred prior to filing her EEOC charge; (2) save for her termination, none of GE Healthcare's actions after Plaintiff filed her charge rise to the level of material adversity; and (3) she is unable to establish a casual link between her complaints and the actions of which she complains. Second, even if Plaintiff were able to establish a *prima facie* case of retaliation, GE Healthcare can demonstrate legitimate non-retaliatory reasons for each allegedly adverse act.

1. *Plaintiff Cannot Establish a Prima Facie Case of Retaliation*

GE Healthcare concedes that when Plaintiff filed a charge with the EEOC on December 4, 2003, she engaged in protected activity.

It is hornbook law that an employer must be aware of protected activity for it to be held liable for retaliation in response to that protected activity. *Shields v. Federal Exp. Corp.*, 2005 WL 102990, *5 (4th Cir. 2005); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case."). Thus, it follows that allegedly adverse employment actions occurring prior to the protected activity cannot form the basis for a retaliation claim. Therefore, GE Healthcare's alleged "ostracizing" and "isolating" of Plaintiff by moving her workstation should not be considered by the Court,

because the move occurred in June or July of 2003, months before she filed her charge with the EEOC in December, 2003. (*Livingston Dep. (Ex. 4) at 235:7-235:20.*) Likewise, Plaintiff's complaints about wearing a white paper suit should be disregarded not only because it was offered to her in response to her perception of dust and bugs in the workplace and because she wore it voluntarily, but also because the event occurred in August or September of 2003 (after she brought a doctor's slip to work), before she filed her charge. (*Livingston Dep. (Ex. 4) at 237:16-240:2 and Ex. 22 thereto*.) Similarly, Plaintiff's complaints about the extra scrutiny given to her timesheets should be ignored because, by her own admission, the alleged scrutiny began in early 2003. (*Livingston Dep. (Ex. 4) at 246:18-247-12.)*

Further, save for the issuance of formal discipline which led to her ultimate termination, none of the events about which Plaintiff complains rise to the level of material adversity.[5] As this Court has held, a plaintiff must show that alleged retaliation "produces an injury or harm," that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Wykoff v. State*, 522 F.Supp.2d 530, 535 (D. Md. 2007) (*quoting Burlington Northern*, 126 S.Ct. at 1214-15). Neither in her Complaint, nor in her deposition, did Plaintiff flesh out how the myriad alleged wrongs by GE Healthcare produced any injury or harm, nor how they would prevent a reasonable employee from complaining of discrimination. She did not lose pay, (in fact she received a raise in the spring of 2004), nor was she denied a promotion, nor were her duties or working conditions modified. To the contrary, the incidents plaintiff complains of – "snooping" at her workstation, "scrutinizing" her timesheets and denying her request to be laid off – are at most the type of "petty slights" and "minor annoyances" described

---

[5] Written reprimands, in and of themselves, do not necessarily qualify as materially adverse employment actions. *Lewis v. Forest Pharms., Inc.*, 217 F.Supp.2d 638, 648 (D. Md. 2002). However, to the extent they are later relied upon as a basis for termination, they are at least arguably materially adverse. *Jeffers v. Thompson*, 264 F.Supp.2d 314, 330 (D. Md. 2003).

by the Supreme Court in *Burlington Northern* and thus cannot be classified as materially adverse employment actions.

Moreover, Plaintiff cannot establish a causal link between her protected activity and the allegedly materially adverse actions by GE Healthcare. The only direct evidence of retaliation she offers – Mr. Jeznach's seemingly too convenient utterance after her employment was terminated – is completely uncorroborated. Further, not only does Mr. Jeznach deny saying anything of the sort to plaintiff, but Ms. Heinrich, who was present at the meeting, did not hear anything. Even Plaintiff herself did not claim Mr. Jeznach had made this statement in the retaliation charge she filed with the EEOC less than two months after her discharge. (*Livingston Dep. (Ex. 4) at Ex. 3.*) Plaintiff's late allegation is precisely the type of self-serving, uncorroborated assertions that the courts have historically rejected as bases for retaliation claims. *See, e.g., Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 280-81 (4th Cir. 2000).

Any inference of causation is further undermined by the timing of Plaintiff's long history of discipline vis-à-vis the filing of her EEOC charge. The series of events that ultimately led to termination of her employment began well before she filed an EEOC charge. In fact, she received poor ratings on her performance reviews for the same reasons – attendance, overall disposition and safety – both before the EEOC charge was filed, on January 10, 2003, June 11, 2003 and, after the EEOC charge was filed, on April 13, 2004. Moreover, she was told by the company president on October 3, 2002 that she was close to losing her job and was given a final warning after she physically threatened a co-worker. Similarly, she admits that her timesheets had attracted increased scrutiny from her supervisors as early as the beginning of 2003. Where "gradual adverse job actions began well before plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452

F.3d 299, 309 (4th Cir. 2006) (*citing Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. 2001)).

>   **2.     *Plaintiff is Unable to Demonstrate that GE Healthcare's Articulated Legitimate, Non-Discriminatory Reasons for Disciplining and Ultimately Terminating Her are Pretextual***

Even if Plaintiff were able to establish a *prima facie* case of retaliation, her complaint cannot survive summary judgment because for each allegedly retaliatory action, GE Healthcare is able to demonstrate a legitimate, non-discriminatory reason for its decision.

>   **a.     Termination of Plaintiff's Employment**

Plaintiff was terminated because GE Healthcare discovered that she falsified her timesheet immediately after engaging in four instances of disruptive and insubordinate behavior for which she received a written warning, and shortly after having received a written warning for two safety violations. (*Heinrich Dep. 9 (Ex. 1) at 28:14-30:9*.)  As Mr. Jeznach put it, she was terminated for "an accumulation of disruptive behavior." (*Jeznach Dep. (Ex. 5) at 72:19-73:5*.)

The written warning regarding safety violations was issued according to GE Healthcare's standard practice for addressing safety issues. (*Heinrich Aff. (Ex. 2) at ¶ 3c*.)  Plaintiff acknowledges that she had been approached by her supervisor in the past about issues with her shoes, although she denies being given the written warning at issue. (*Livingston Dep. (Ex. 4) at 75:11-77:11*.)  In any event, Plaintiff points to no evidence that the safety warning was in any way related to her EEOC charge.

The written warning for disruption and insubordination followed four highly offensive episodes between Plaintiff and her manager, Ms. Marroquin, between April 13 and April 29, 2004: 1) the "all your asses are fired" incident coupled with telling Ms. Marroquin that the safety warning was "shit;" 2) the "false meeting" incident; 3) the "shackles on my feet" incident; and 4) walking away from Ms. Marroquin while she was telling plaintiff not to gossip.  The details of

14

these incidents are set forth above in the Facts section, and certainly provide support for the written warning that was handed down. Plaintiff cannot argue that the warning, which was given in response to her behavior, was animated by a desire to retaliate against her for filing a charge with the EEOC.

That Plaintiff's termination came hot on the heels of the above incidents, and just after it was discovered that she had falsified her time sheets, undermines any argument in favor of a retaliatory motive for her termination to the point that it finally crumbles under its own weight.

### b. Plaintiff's Other Claimed Bases for Retaliation

Putting aside the incidents that Plaintiff admits occurred prior to her ever filing the charge, Plaintiff's remaining claims are either entirely self-serving and uncorroborated, or were demonstrably not animated by a desire to retaliate against her for filing an EEOC charge. In the first category is her claim that Mr. Jeznach told other African-American employees not to talk to her. The claim is ridiculous on its face, was rejected by Plaintiff's own witness, and should be disregarded.

In the second category are Plaintiff's claims that GE Healthcare "spied" on her by "snooping around" her workstation, "scrutinized" her time sheets, and refused to lay her off. As for "snooping around" her workstation, as Ms. Marroquin explained at the time, management was perfectly entitled to look for work supplies at her work station. (*Heinrich Aff. at ¶ 3b; Livingston Dep. (Ex. 4) at Ex. 21*.) Similarly, management is certainly entitled to scrutinize the timesheets of any employee to make sure that time is entered accurately. Indeed, as it turned out Plaintiff was terminated precisely because she had falsified her timesheet. Finally, putting aside the fact that employees are by no means entitled to be laid off at any time, Plaintiff ignores the fact that GE Healthcare was not laying anyone off at the time she asked to be laid off, so the

company's refusal to do so cannot have been discriminatory.  (*Livingston Dep. (Ex. 4) at 258:1-258:7.*)

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their motion for summary judgment, and dismiss plaintiff's complaint with prejudice.

Respectfully submitted,

_____/s/_____
Michael Aldana (admitted *pro hac vice)*
Quarles & Brady LLP
411 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 277-5151

and

Elena D. Marcuss (Bar No. 25547)
McGuire Woods LLP
7 Saint Paul Street, Suite 1000
Baltimore, MD 21202
(410) 659-4400

Attorneys for Defendants

**APPENDIX OF EXHIBITS**

| Ex. No. | Description |
| --- | --- |
| 1 | Select portions of the deposition of Laura Heinrich |
| 2 | Affidavit of Laura Heinrich |
| 3 | Select portions of the deposition of William Knight |
| 4 | Select portions of the deposition of Diana Livingston |
| 5 | Select portions of the deposition of Craig Jeznach |
| 6 | Select portions of the deposition of Constance Williams |

\5069037.1